THE STATE OF WASHINGTON, *Respondent,* v. ARTHUR
LEROY WAKELEY, *Appellant.*

*Greg Boos,* for appellant (appointed counsel for appeal).

*David S. McEachran, Prosecuting Attorney,* and *Mac-Duffie Setter, Deputy,* for respondent.

JAMES, C.J.—Defendant, Arthur Leroy Wakeley, appeals his conviction for possession of marijuana. We affirm.

On February 4, 1980, Bellingham police received a report of shots being fired. The report was phoned by Lloyd and June Ewing, landlords of an apartment complex. Lloyd, June, and a guest heard what they thought were three gunshots at about 10:30 in the evening. June Ewing thought she heard the sound of gun bolt action. The Ewings then observed a man walking from the area where the shots apparently originated to an orange colored Pinto automobile. He remained in the car for about 5 minutes. He then left and was out of sight for about 5 minutes before returning to the car. The Ewings also observed another person seated in the car. The car was then driven from the area. The Ewings provided the police with a description of the driver and the car.

After receiving the report, the Bellingham police dispatched an officer to the apartment complex to investigate. As he approached the area, the officer observed an orange colored Pinto heading toward him. The car matched the description broadcast over the police radio, the driver matched the Ewings' description, and there was a passenger in the car. As the officer passed the car, he observed the driver attempting to hide something with his coat. The officer pursued and stopped the car.

Because he believed the occupants of the car had been involved in a shooting incident, the officer radioed for backup assistance. Two other officers arrived; all the officers unholstered their revolvers and directed the occupants to exit the vehicle, one at a time. Wakeley, the driver, was the first to exit. He was frisked for weapons, handcuffed, and instructed to kneel on the ground behind the car. The passenger was then subjected to the same procedure. As the passenger exited, one of the officers observed, in plain view, a plastic bag of green vegetable matter which he recognized

to be marijuana. The officers then arrested Wakeley and his companion for possession of marijuana.

 Wakeley first contends his detention was an arrest made without probable cause. He argues that under *State v. Byers,* 88 Wn.2d 1, 6, 559 P.2d 1334 (1977), he was "under arrest from the moment [he was] not, and knew [he was] not, free to go", and that because his arrest was not based on probable cause, the marijuana must be excluded under the poisonous tree doctrine. *See Wong Sun v. United States,* 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963). In a recent case involving an investigative stop, we stated:

No argument was made that the stop in *Byers* was a permissible investigative stop. It is questionable whether *Byers* is of any import insofar as an investigative stop is concerned.

The concept in *Byers* that an arrest, requiring probable cause, occurs when a suspect's movement is fully restricted is not helpful in the investigative stop context.

*State v. Gardner,* 28 Wn. App. 721, 725, 626 P.2d 56 (1981). In this case, as in *Gardner,* we believe that the *Byers* analysis is inapplicable.

A stopping for investigation is not a lesser intrusion, as compared to arrest, because the restriction on movement is incomplete, but rather because it is brief when compared with arrest, which (as emphasized in *Terry* [*v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)]) "is inevitably accompanied by future interference with the individual's freedom of movement, whether or not trial or conviction ultimately follows."

The better view, then, is that an otherwise valid stop is not inevitably rendered unreasonable merely because [the suspect's freedom to move was completely restricted].

*State v. Gardner, supra* at 725–26, quoting 3 W. LaFave, *Search and Seizure* § 9.2, at 30 (1978).

 A police officer may stop and briefly detain a person for investigative purposes on less than probable cause.

[W]here officers entertain a *well–founded* suspicion not amounting to probable cause, they may stop the suspected person, identify themselves and require the sus-

pect to identify himself and explain his activity without being adjudged to have made a formal arrest.

(Italics ours.) *State v. Gluck,* 83 Wn.2d 424, 426, 518 P.2d 703 (1974). An officer's "well–founded" suspicion may be based on information supplied by an informant. *Adams v. Williams,* 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972). But "[a]n informant's tip cannot constitutionally provide police with such a [well–founded] suspicion unless it possesses sufficient 'indicia of reliability.'" *State v. Sieler,* 95 Wn.2d 43, 47, 621 P.2d 1272 (1980).

Generally, citizen–informants (as distinguished from "professional" police informants) are deemed presumptively reliable sources of information. As stated in 1 W. LaFave, *Search and Seizure* § 3.4, at 588 (1978):

> [C]ourts have rather consistently held that the proof–of–veracity rules which obtain in informant cases are not applicable with respect to other sources of information. This result has been reached when the source of the information has been characterized as a "victim" or "eyewitness to the crime," "a cooperative citizen," "an informant not from the criminal milieu," a "citizen–informer," or a "nonprofessional informant." The most common case is that in which a person appearing to be an average citizen takes the initiative in communicating to the police the fact that he has been the victim of or a witness to a crime such as robbery.

(Footnotes omitted.) But, if a citizen–informant refuses to give his name, *see State v. Chatmon,* 9 Wn. App. 741, 515 P.2d 530 (1973), or if only the name of the informant has been relayed to the police, *see State v. Sieler, supra,* the police may not be justified in concluding the tip comes from a reliable source. We believe, however, that where, as in this case, the citizen–informant identifies himself by name, gives his address, phone number, and other background information, the police may react in the belief the report comes from a reliable source.

Not only must the source of the information be reliable, but also the report must contain objective facts to justify the pursuit and detention of a suspect.

> [T]he State generally should not be allowed to detain and question an individual based on a reliable informant's tip which is merely a bare conclusion unsupported by a sufficient factual basis which is disclosed to the police prior to the detention.

(Footnote omitted.) *State v. Sieler, supra* at 48. In this case, unlike *Sieler,* the Ewings' report was not a bare conclusion. They reported three gunshots being fired at the apartment complex. One of the witnesses thought she heard the sound of gun bolt action. They gave a detailed description of Wakeley's car, a description of Wakeley himself, and information that Wakeley had acted in a suspicious manner after the shots had been fired. As the officer approached the vicinity of the reported shots, he observed a vehicle matching the description given by the citizen–informant. He observed the suspect attempt to hide something. Under the facts and circumstances of this case, the police were justified in stopping Wakeley's vehicle because they had "a well founded suspicion based on objective facts that [Wakeley was] connected to actual or potential criminal activity." *State v. Sieler, supra* at 46.

The police in this case were responding to a report of gunshots in a residential apartment complex. "[T]he seriousness of the criminal activity reported by an informant can affect the reasonableness calculus which determines whether an investigatory detention is permissible." *State v. Sieler, supra* at 50.

> Both *Terry* and *Adams* emphasize that no single rule can be fashioned to meet every conceivable confrontation between the police and citizen. Evaluating the reasonableness of the police action and the extent of the intrusion, each case must be considered in light of the particular circumstances facing the law enforcement officer.

*State v. Lesnick,* 84 Wn.2d 940, 944, 530 P.2d 243 (1975). The officers' decision to adopt an immediate response was reasonable because crimes involving firearms present a serious threat of physical injury. *See ALI Model Code of Pre–Arraignment Procedure* § 110.2(1)(c) (Proposed Offi-

cial Draft, 1975).

■ Because the information known to the officers indicated that Wakeley had been involved in a shooting incident, they were justified in conducting a self–protective search of the occupant of the car based on less than probable cause. *See Terry v. Ohio, supra. See also Pennsylvania v. Mimms,* 434 U.S. 106, 54 L. Ed. 2d 331, 98 S. Ct. 330 (1977). As LaFave correctly observed, "[W]hether it is proper to make a protective search incident to a stopping for investigation is a question separate from the issue of whether it is permissible to stop the suspect; not all stops call for a frisk." 3 W. LaFave § 9.4, at 115. In this case, not only did the citizen–informant's report contain information that a shooting had occurred, but also the police in their initial observation saw Wakeley hiding something. We, therefore, conclude that the officers' actions in requesting the occupants to exit their vehicle and submit to the limited intrusion of the frisk for weapons was permissible.[1]

The officers were lawfully in a position to view the marijuana, and their seizure of the contraband was proper. *See State v. Chrisman,* 24 Wn. App. 385, 600 P.2d 1316 (1979).

Affirmed.

CALLOW and RINGOLD, JJ., concur.

Reconsideration denied June 9, 1981.

Review denied by Supreme Court September 3, 1981.

---

[1]Although, normally, handcuffing an individual is not within the scope of an investigative stop and *Terry* frisk, in appropriate cases handcuffing may be "reasonable, as a corollary of the lawful stop." *United States v. Purry,* 545 F.2d 217, 220 (D.C. Cir. 1976). Here, in view of the potential seriousness of the suspected activity, as well as the fact that the encounter took place at night, the handcuffing was reasonably related to ensuring the officers' and the suspects' safety.